IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:11-CR-118 |
| | ) | |
| v. | ) | Honorable Leonie M. Brinkema |
| | ) | |
| RAYMOND BOWMAN | ) | Sentencing Date: June 10, 2011 |
| | ) | |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States of America, through its attorneys, Denis J. McInerney, Chief, Fraud Section of the Criminal Division of the United States Department of Justice, Patrick F. Stokes, Deputy Chief, and Robert A. Zink, Trial Attorney, and Neil H. MacBride, United States Attorney for the Eastern District of Virginia, Charles F. Connolly and Paul J. Nathanson, Assistant United States Attorneys, in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual ("Guidelines" or "U.S.S.G.") § 6A1.2 (Nov. 2010), files this Position of the United States With Respect to Sentencing of the defendant, Raymond Bowman. For the reasons discussed herein, the government requests that the Court sentence the defendant to an initial term of incarceration of ten years – the statutory maximum – and then reduce that sentence by the 50% based on the defendant's substantial assistance to the government's investigation for a final sentence of five years' (60 months') incarceration.

*Background*[1]

Taylor, Bean & Whitaker Mortgage Corp. (TBW) was a mortgage company based in Ocala Florida.  Colonial Bank was one of the 25 largest depository banks in the country and was based in Montgomery, Alabama.  Colonial's Mortgage Warehouse Lending Division ("MWLD") provided financing to mortgage origination companies, including TBW.  Ray Bowman joined TBW in 1999 and became President of TBW in 2002.  At all times he reported directly to Lee Farkas, the chairman and principal owner of TBW.

From approximately 2002 through August 2009, Farkas and numerous co-conspirators, including Raymond Bowman, defrauded three banks of more than $2.9 billion, misled shareholders of Colonial BancGroup, Inc., and attempted to fraudulently obtain more than $500 million from the government's TARP program.

The conspiracy consisted of five separate schemes:

1. **Overdraft / sweeping scheme:**  Beginning in 2002, Farkas and other co-conspirators including Bowman engaged in a "sweeping" scheme to hide overdrafts in TBW bank accounts held at Colonial Bank.  TBW ran large overdrafts in its Master Account to cover its operating expenses.  To cover up the overdrafts, conspirators "swept" funds on a daily basis into this account from the Investor Funding Account, a Colonial Bank-controlled account.  The sweeping scheme, which grew to approximately $140 million, continued until approximately December 2003.  In addition to Farkas and Bowman, other co-conspirators participating in the sweeping scheme included Cathie Kissick, head of the MWLD at Colonial Bank, and Teresa Kelly, an MWLD operations supervisor.

---

[1] In light of this Court's familiarity with the facts of this case, the Government includes only a brief overview and recitation of the key facts.

2. **Plan B on COLB.**  In December 2003, Farkas and Kissick implemented "Plan B," a new phase of the scheme in which they caused the deficit covered up by the sweeping scheme to be moved to the COLB facility.  While Plan B was initially supposed to be a one-time event, the conspirators continued to engage in Plan B transactions for years.  Under Plan B, conspirators caused TBW to engage in fake sales of mortgage assets to Colonial Bank.  TBW pretended to sell mortgage loans to Colonial Bank, and the bank advanced TBW money for the loans.  In fact, the mortgage loans either did not exist or had already been sold to other banks or investors.  By mid-2005, Colonial Bank held approximately $250 million in Plan B loans on its books.  Bowman repeatedly told Farkas that he thought Plan B was unethical and possibly illegal.  Nevertheless, Bowman assisted Farkas on a handful of occasions in requesting Plan B loan data to be sent to Colonial.  In addition to Farkas and Kissick, Bowman, Desiree Brown – TBW's Treasurer – and Kelly also participated in Plan B.

3. **Plan B on AOT.**  Plan B on COLB grew to approximately $250 million and, because of the number of loans involved, became difficult for the conspirators to administer.  In 2005 the conspirators moved Plan B from COLB to Colonial's Assignment of Trade (AOT) facility.  The AOT facility was intended for the purchase of pools of loans that TBW was in the process of selling or securitizing.  Under this new version of Plan B, the conspirators engaged in fake sales of pools of loans to Colonial Bank, and in return TBW received over $1.3 billion from Colonial Bank from mid-2005 through mid-2008.  The Plan B pools of loans that TBW sold Colonial Bank consisted of nothing more than data for pools of loans that TBW had already sold to other investors.  As such, the Plan B data were worthless to Colonial Bank.  TBW paid down some of the Plan B balance on AOT over time, and by August 2009 Colonial Bank held approximately $500 million worth of worthless Plan B pools on the AOT facility.  Bowman's role in Plan B

decreased as Desiree Brown's role increased, and Bowman was not actively involved in the Plan B on AOT phase of the scheme.  Co-conspirators involved with Plan B on AOT included Farkas, Kissick, Brown and Kelly.  As a result of Plan B, Colonial BancGroup, the public holding company for the bank, significantly overstated the mortgage assets held by the MWLD in BancGroup's public financial filings, including its annual reports (Forms 10-K) and quarterly reports (Forms 10-Q).

    4. **Ocala Funding ("OF").**  OF was a standalone subsidiary of TBW.  It was designed to provide low-cost funding to TBW for additional mortgage loan originations.  It was also set up to be bankruptcy remote.  OF issued commercial paper (corporate IOUs) to investors in return for cash.  OF would then use the cash to fund mortgage loans at TBW.  OF was required to have at all times more assets (cash + loans) than liabilities (the commercial paper).  And, OF cash could only be used for OF purposes.

When TBW ceased operations in August 2009, there were two investors in OF: Deutsche Bank ("DB") and BNP Paribas, who owned a combined approximately $1.75 billion in commercial paper.  Farkas and other co-conspirators caused nearly all of the assets in OF to be stripped out and used to pay other TBW expenses, including mandatory servicing advances to investors in mortgage bonds TBW had sold.  To cover up the missing assets, co-conspirators caused OF loans already sold to Freddie Mac to continue to appear as collateral at Colonial Bank and OF.  As a result, Colonial Bank believed it owned $900 million in loans that had already been sold to Freddie Mac, and DB and BNP Paribas, as the investors in OF, believed they had approximately $1.67 billion in loan collateral backing their supposedly asset-backed commercial paper when in fact there was only collateral of roughly $160 million.  Brown, Paul Allen -- TBW's CEO, and Sean Ragland -- a TBW financial analyst – facilitated the conspiracy by

causing false collateral reports to be sent to DB and BNP Paribas as well as the custodian for OF, LaSalle Bank (purchased by Bank of America in 2007), that inflated by hundreds of millions of dollars the actual value of the collateral backing the commercial paper.  Bowman was aware of the collateral deficit in OF, but was not actively involved in the OF phase of the scheme.  Kissick and Kelly were also not involved in the OF phase of the fraud scheme, and Colonial Bank was a victim of this fraud.

     5.  **Capital Raise.**  In the fall of 2008, Colonial BancGroup, Colonial Bank's holding company, applied for more than $550 million of TARP funds.  Colonial BancGroup was approved for $553 million contingent upon its raising an additional $300 million in private capital.  In early 2009, TBW undertook to lead the capital raise.  TBW said it would invest $150 million itself and would find two private equity investors to invest $50 million each.  Colonial BancGroup undertook to raise the remaining $50 million from other companies with which it did business.  Ultimately, Colonial BancGroup announced on March 31, 2009, that it had met its contingency.  That was false; TBW had falsely represented the participation of the two $50 million private equity investors and misrepresented where the 10% deposit for TBW itself had come from.  Moreover, Colonial BancGroup's TARP application, which incorporated the bank's financial statements, was materially false in that the fraud scheme caused the bank to significantly overstate the value of mortgage assets on its books.  Farkas and Allen were involved in falsely representing the participation of the two $50 million private equity investors. Brown assisted Farkas in obtaining a $25 million deposit on behalf of TBW and the two equity investors by taking the money from OF.  While Kissick was not aware of Farkas's misrepresentations regarding the equity investors, she knew that Colonial BancGroup's TARP

application relied upon false bank financial data. Bowman, Kelly and Ragland were not involved in this aspect of the fraud scheme.

Ultimately, six co-conspirators, including Bowman, pleaded guilty to their involvement in the conspiracy and fraud scheme and agreed to cooperate with the government. On April 19, 2011, Lee Farkas was convicted by a jury of all 14 counts of the indictment.

*Argument*

As this Court is aware, following the Supreme Court's decision in *United States v. Booker*, the Guidelines are now advisory. *United States v. Booker*, 543 U.S. 220, 261 (2005). As such, "[i]n the wake of *Booker* . . . the discretion of the sentencing court is no longer bound by the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). The Supreme Court subsequently clarified that this means that the sentencing court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007), *quoted in Nelson v. United States*, --- US ----, 129 S.Ct. 890, 892 (2009). Nevertheless, "sentencing courts are not left with unguided and unbounded sentencing discretion." *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006). Instead, at sentencing a court "must first calculate the Guidelines range." *United States v. Nelson,* 129 S. Ct. at 891; *see also United States v. Hughes*, 401 F.3d at 546 (holding that a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'") (*quoting United States v. Booker*, 542 U.S. at 264). After appropriately calculating the Guidelines, a sentencing court must then consider the Guidelines range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is appropriate for the individual defendant. *United States v. Nelson,* 129 S. Ct. at 891-92, *see also United States v. Hughes,* 401 F.3d at 546.

I.      THE APPROPRIATE GUIDELINES RANGE

Bowman pleaded guilty to a two-count criminal information. Count one charged him with conspiracy to commit bank fraud, wire fraud and securities fraud in violation of 18 United States Code, § 371. Count two charged him with false statements in violation of 18 United States Code, § 1001. Both counts have a five-year statutory maximum period of incarceration. The Probation Officer found, and the parties stipulated in the plea agreement, that the two counts group for purposes of determining the appropriate Guidelines level. *See* U.S.S.G. § 3D1.2(c).

The Probation Officer calculates that Guidelines offense level to be 46. In particular, the Probation Officer includes a base offense level of six, a 30-level adjustment for a loss of more than $400 million, a six-level adjustment for the number of victims, a four-level adjustment for substantially jeopardizing the safety and soundness of a financial institution (reduced by two levels pursuant to U.S.S.G. § 2B1.1(b)(14)(C) for a combined increase with the victim-adjustment of eight levels), a two-level adjustment for sophisticated means, and a three-level reduction for acceptance of responsibility. Bowman stipulated to these adjustments and enhancements in his plea agreement and the government believes that the Probation Officer correctly applied the Guidelines. The resulting Guidelines range is life.

Although Bowman faces a five-year statutory maximum per count of conviction, U.S.S.G. § 5G1.2(d) of the Guidelines directs the Court to impose any periods of incarceration consecutively to give maximum effect to the established Guidelines' range. *See,* U.S.S.G. § 5G1.2, comment n.1 ("If no count carries an adequate statutory maximum, consecutive sentences are to be imposed to the extent necessary to achieve the total punishment."). Thus the statutory maximum is ten years incarceration.

## II. SENTENCING RECOMMENDATION

Bowman knew that his actions were fraudulent and likely illegal. He warned Farkas that Plan B was "likely illegal" and had multiple discussions with Farkas about the possibility of going to jail. Despite this knowledge, Bowman assisted in aspects of the scheme. He was actively involved in the sweeping and Plan B on COLB parts of the scheme, and also participated in the effort by TBW to inflate falsely the value of TBW's mortgage servicing rights (MSR), which allowed TBW to borrow more money than it otherwise would have been able. With Farkas's approval and consent, Bowman and others falsified the MSRs, at times by billions of dollars. Bowman also remained as the President of TBW until TBW's corporate headquarters were searched by federal agents.

But Bowman's role in the conspiracy was more limited than some of the other co-conspirators. He was not actively involved in, although he had knowledge of, Plan B on AOT and the Ocala Funding aspects of the scheme. And he had no role in the Capital Raise fraud. For this reason, the government agreed to charges that established a ten year statutory maximum period of incarceration. The Guidelines call for imposition of that statutory maximum. Given Bowman's senior position at TBW, his role in Plan B on COLB and the MSR inflation, and the staggering losses caused by the overall conspiracy, the government asks this Court to impose the statutory maximum as an initial sentence before reducing it pursuant to the government's substantial assistance motion.

## III. THE 18 U.S.C. § 3553(A) FACTORS

After calculating the appropriate Guidelines range, "the court must 'determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Moreland*, 437

F.3d 424, 432 (4th Cir. 2006) (quoting *Green*, 436 F.3d at 455). Section 3553(a) directs the sentencing court to consider various factors including the nature and circumstances of the offense and characteristics of the defendant. In addition, § 3553(a) states that the court must consider other factors, including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) & (B).

### A. *An Initial Sentence of Ten Years Incarceration Is Appropriate and Reasonable in Light of the Nature of Defendant's Criminal Conduct*

One key factor that the Court must consider is the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The defendant in this case participated in a massive fraud scheme, one of the longest-running and largest bank-fraud operations in history. While the scheme spanned eight years, the defendant's active participation in Plan B ended in 2005. He continued to be aware of fraudulent activity at TBW and participated in other schemes, such as the effort to inflate the value of MSRs. As the president of TBW, Bowman assisted Farkas's efforts to steal hundreds of millions of dollars from Colonial Bank through Plan B. Bowman knew that without the cash from Colonial Bank, TBW would likely fail.

Bowman had extensive experience in the mortgage industry and recognized early on that Plan B was unethical and likely illegal. He repeatedly told Farkas that TBW should stop Plan B, but would assist Farkas when directed to do so. As President of TBW, Bowman was well compensated, earning over $400,000 per year by 2008, however, the evidence shows that Bowman – unlike Farkas – did not receive direct compensation from the fraud scheme. Bowman's important – although limited – role in one of the largest fraud schemes in recent history warrants a substantial sentence, and we believe imposing an initial sentence at the

statutory maximum of 10 years before applying a reduction for substantial assistance appropriately reflects the nature and circumstances of the crime and his history and characteristics.

> 2. *An Initial Sentence of Ten Years Is Necessary to Provide A Reasonable Deterrent Factor*

The Court must also consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence. *See* 18 U.S.C. § 3553(a)(2). Fraud cases are serious offenses, and those who commit such offenses deserve particularly severe sentences because the nature and complexity of the fraud they commit requires such significant time and resources to detect, prosecute, and deter. A ten year initial sentence would appropriately reflect the seriousness of the offense and provide just punishment in this case.

Imposing an initial sentence of ten years would also afford both specific and general deterrence, as required by 18 U.S.C. § 3553(a)(2)(B). Bowman knowingly and intentionally facilitated a massive fraud scheme for years, contributing to the collapse of Colonial Bank. While Bowman's cooperation with the government's investigation suggests that he has fully accepted responsibility for his actions, his lengthy participation in the scheme warrants a sentence that will impress upon him, as well as others, that such conduct will not be treated lightly or tolerated.

General deterrence alone can justify lengthy sentences, even where such long sentences are not necessary to achieve specific deterrence. *United States v. Sagendorf*, 445 F.3d 515, 518 (1st Cir. 2006). Fraud offenses are serious, and a lengthy sentence will ensure that would-be violators do not receive the message that the gain to be derived from defrauding financial institutions, shareholders, or the government outweighs the potential consequences. Here, where

the defendant facilitated a massive fraud scheme over a series of years, a significant sentence is necessary to send a strong deterrence message to others.

If the sentence truly is to "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," and "afford adequate deterrence to criminal conduct" it must be substantial. *See* 18 U.S.C. § 3553(a)(2). This is particularly true here in light of the size of the fraud scheme, its duration, and the substantial damage it caused. An insubstantial sentence would signal that the type of long-standing, egregious fraud in which the defendant engaged is somehow deserving of special consideration from the Court. Moreover, if individuals who defraud financial institutions and corporate shareholders and attempt to defraud the United States believe that the penalty for doing so is trivial, then no disincentive exists to prevent those who are best-equipped with the means and ability to commit fraud from doing so. An initial sentence of ten years before applying a reduction for substantial assistance is necessary to satisfy the requirements of § 3553(a)(2).

### 3. *The Need to Avoid Unwarranted Sentencing Disparities*

The government's recommendation that the Court impose an initial sentence of ten years for Bowman will also avoid any unwarranted sentencing disparities between Bowman and his co-defendants who pleaded guilty and testified against Farkas.[2] Bowman faces a shorter initial sentence than Brown and Kissick because, like Allen, Ragland and Kelly, he had a more limited role in the overall scheme. The government also intends to recommend a statutory maximum sentence, prior to any reduction for substantial assistance, for Allen, Ragland, and Kelly.

---

[2] The government has included a chart in its under-seal motion for a reduction in sentence that contains its sentencing recommendations, including suggested reductions for substantial assistance, for each of the cooperating co-defendants. In addition, the government has a more fulsome explanation of the comparative culpabilities of the six cooperators in the sentencing position it filed with respect to Desiree Brown.

The government intends to recommend a substantially higher sentence for Farkas. The government respectfully submits that an initial sentence for Bowman of ten years (and the recommended initial sentences for the other co-defendants) will not create an unwarranted disparity with a lengthy sentence imposed on Farkas because of the substantially different roles each played in the scheme and the different postures of their cases. Farkas led the fraud scheme, in part, by manipulating his co-defendants and limiting the flow of information to them. He was the overwhelming beneficiary of the scheme, he stood to gain the most as the owner of TBW, and he lived a lavish lifestyle that none of his co-conspirators shared. Bowman's and his cooperating co-defendants' cases also are in a very different posture than Farkas's. They each pleaded guilty pre-indictment, fully accepted responsibility, have shown remorse for their actions, and cooperated substantially with the government's investigation. Thus, for Bowman, an initial sentence of ten years will not create an unwarranted disparity with a much lengthier sentence imposed on Farkas.

4. *Substantial Assistance Reduction*

For the reasons set forth in the government's motion for a downward departure, we ask this court to reduce Bowman's ten-year initial sentence by 50% and impose a final sentence of five years' incarceration.

5. *Restitution*

The government is still in the process of identifying victims and their loss amounts. The amount of potential restitution in this case is enormous, with some defendants potentially facing restitution orders of up to $2.9 billion. While it is unlikely that the victims will recover the full amount from the defendants, the government needs additional time to identify victims and the amounts they are owed to ensure they are able to recover ratably from any restitution payments

made by Bowman (or the other defendants). Therefore, after consultation with defense counsel and pursuant to 18 U.S.C. § 3664(d)(5), the government respectfully moves the Court to defer the entry of the restitution order until after the Farkas sentencing hearing. In particular, the government requests a date approximately one week after the Farkas sentencing hearing to submit to the Court a proposed restitution order for Bowman (as well as all other defendants) that reflects all of the victims identified to date. This will ensure that late-identified victims and changes to loss figures based on additional review are consistently reflected in each restitution order.

### *Conclusion*

The United States believes that an initial sentence at the statutory maximum is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a). The United States also asks that this Court grant the defendant a downward departure of 50% based on his substantial assistance to the government and impose a final sentence of incarceration of five years.

Respectfully submitted,

Neil H. MacBride
United States Attorney

By: _____/s/_____
Charles F. Connolly
Paul Nathanson
Assistant United States Attorneys
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: Charles.Connolly@usdoj.gov
Paul.Nathanson@usdoj.gov

Respectfully submitted,
Denis J. McInerney
United States Department of Justice
Chief, Criminal Division, Fraud Section

By: _____
Patrick F. Stokes
   Deputy Chief
Robert Zink
   Trial Attorney
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
Ph; 202.305.4232
Fax: 202.514.7021
Patrick.Stokes2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of June 2011, I filed electronically the foregoing Position of the United States with Respect to Sentencing using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Eric Yaffe, Esq.
Gray Plant Mooty
Suite 1111 - The Watergate
2600 Virginia Avenue NW
Washington, DC 20037
Eric.Yaffe@gpmlaw.com

Karen Moran
Senior U.S. Probation Officer
Karen_Moran@vaep.uscourts.gov

          /s/
Charles F. Connolly
Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone:  (703) 299-3771
Fax:  (703) 299-3981
Email:  Charles.Connolly@usdoj.gov